UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 1:13CR 16 SNLJ |
| ) | |
| GARY WAYNE BENDER, ) | |
| ) | |
| Defendant. ) | |

## **REPORT AND RECOMMENDATION**

The defendant is charged with Health Care Fraud.

The defendant has filed his Motion to Suppress (Document #40) alleging that when he was interviewed on September 22, 2011, he made statements against his interest which the government intends to use against the defendant at his trial. The defendant alleges that such statements were involuntarily made because of defendant's limited mental capacity and that his will was overborne by the presence and conduct of the many officials and law enforcement personnel present during the interview. (Document #40, p. 1).

The defendant requests in his motion that the statements made by defendant against his interest on September 22, 2011, be suppressed.

### **Factual Background**

On September 22, 2011, the defendant, 45 years old at the time, was interviewed pursuant to a written proffer agreement. Missouri Public Defenders Steve Lynxwiler and Ian Page were present during the proffer interview. They were representing the defendant in a state criminal case in Butler County, where the defendant was facing multiple felony counts. Prior to any questions

being asked, apart from the others, the defendant's attorneys read and explained the proffer agreement to the defendant. He was given an opportunity to ask questions of his attorneys. He then signed the agreement. The proffer agreement was not introduced at the evidentiary hearing on defendant's motion to suppress.

The interview took place in the conference room of the United States Attorney's Office (USAO) in Cape Girardeau. In addition to the defendant and his attorneys, the following persons were present and identified themselves by name and title before the defendant was questioned.

>AUSA Larry Ferrell, USAO, Cape Girardeau
>AUSA Dorothy McMurtry, USAO, St. Louis
>Special Agent Stacey Jordan, HHS/OIG, St. Louis
>Intelligence Analyst Lynn Hubert, FBI, St. Louis
>Mindy Ulstad, Investigator, Missouri Medicaid Fraud Control Unit,
>  Attorney General's Office
>Justine Guyer, Missouri Assistant Attorney General
>Sgt. Dennis Overbey, Missouri State Highway Patrol
>Bruce Van Belle, Carter County Sheriff
>Jason Dunn, Missouri State Division of Fire Safety
>David Hansen, Missouri Assistant Attorney General
>Kevin Zoellner, Missouri Assistant Attorney General

The defendant was seated at a large conference table as were some of the other persons who were present. He was not restrained in any way and was able to consult with his attorneys during the proffer. Government attorneys, representatives of state and federal agencies questioned the defendant related to the different areas under investigation.

## Discussion

In determining whether a defendant made a knowing, intelligent, and voluntary statement, courts look at the totality of the circumstances. United States v. Bordeaux, 980 F.2d 534, 538 (8th Cir. 1992). The statement is involuntary if "pressures exerted on a suspect have overborne his will."

United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990). The two factors that a court must consider when determining whether a suspect's will was overborne is the conduct of the law enforcement officials and the suspect's capacity to resist the pressure to make a statement. Id.

Mental capacity or limited intelligence is but one factor to consider. United States v. Quinn, 130 Fed.Appx. 832 (8th Cir.) (per curiam), cert. denied, 545 U.S. 1121 (2005). A suspect's mental condition alone does not render his statements involuntary. Colorado v. Connelly, 479 U.S. 157 (1986) ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'").

The burden of proof on the issue of voluntariness is one of a preponderance of the evidence. United States v. Wright, 706 F.2d 828, 830 (8th Cir. 1983). The government must establish by the preponderance of the evidence that a defendant's confession was voluntarily made.

**The Evidentiary Hearing**

The evidentiary hearing centered on the contents and circumstances of the earlier interview/proffer of the defendant. A Report of Interview was attached as Defendant's Exhibit A to the Defendant's Motion to Suppress. The interview was conducted on September 22, 2011, by Special Agent Stacey Jordan of the United States Department of Health and Human Services, Office of Inspector General, Office of Investigations. The interview was part of a proffer agreement and was given by the defendant in the presence of his attorneys, Steve Lynxwiler and Ian Page, State Public Defenders. The introduction to the Report of Interview stated that the interview/proffer was conducted by a number of individuals with the Attorney General's Office, the United States Attorney's Office, Special Agent Stacey Jordan and other law enforcement personnel. The introduction continued that the defendant reviewed the proffer agreement with his attorneys. Mr.

Bender's attorneys read and explained the agreement to Bender and Bender signed it. The introduction continued that after being advised of the nature of the interview/proffer and the identity of all the individuals present for the proffer, the defendant provided the information summarized in the Report of Interview.

The Report of Interview, as indicated at the bottom of the first page of the report, was prepared by Special Agent Stacey Jordan, who was the sole witness at the evidentiary hearing.

Agent Jordan testified at the evidentiary hearing on the motion to suppress. She stated that the defendant's attorneys at the beginning of the proffer related to the persons assembled for the interview that they had discussed the proffer agreement with Mr. Bender. They had read it to him. They provided him with a chance to ask questions. He signed the proffer agreement and the attorneys announced that they were ready to continue. (Tr., p. 8). This took place at the door, ten or twelve feet from the table where the others were seated. (Tr., p. 16).

The summary consists of seven pages. Id. Agent Jordan testified those present were: two AUSAs; the two public defenders representing Mr. Bender; an investigator with the Medicaid fraud control unit; an investigator with the FBI; three assistants with the Attorney General's Office; a member of the Missouri Highway Patrol; an individual from the Missouri Division of Fire Safety; and there was an individual from the Carter County Sheriff's Department. (Tr., p. 9).

Asked why there were so many persons involved in that interview, Agent Jordan stated that they were there because there were so many different allegations "out there" regarding crimes that were committed, different types of crimes that were committed. (Tr., p. 10).

All of the persons present at the interview were introduced. Mr. Bender was seated between his attorneys.

Asked to describe Mr. Bender's demeanor, Agent Jordan stated that he was "Very relaxed. Very cordial. At one point in time he I think put his arm across the chair and laid back, and it just seemed like a very open, comfortable atmosphere." (Tr., p. 10)

Jordan testified that based on Mr. Bender's responses to the questions, his responses appeared to be appropriate in the sense that he understood the questions and the answers were responsive. (Tr., p. 11). Agent Jordan said the answers were "Responsive and beyond what we asked, yes." Asked to explain that statement, Agent Jordan said "He actually provided us with more details and information." The defendant appeared to be able to relate what he had done and what others had done. (Tr., p. 12). Asked if Mr. Bender indicated that he did feel that he had some educational or intellectual limitations, Agent Jordan responded that at the beginning of the proffer, he went through and explained how far he went in school, what he felt his abilities were with reading and writing, and he made it clear he could not spell. He indicated that he had difficulty with reading and with spelling. Agent Jordan stated that at one point in time he said that he was instructed to act dumb. Id. Bender explained that he was instructed to act dumb "in order to get the services that he needed or that they wanted him to have." (Tr., p. 13). Mr. Bender indicated that he was able to operate a motor vehicle. Defendant said he had a driver's license when he turned sixteen in Illinois, and when he came to Missouri, he continued to drive.

When asked what Bender's abilities were in terms of handling the daily activities of life, Jordan responded, "He said that he can cook, clean, even described himself as a clean freak, that he likes his apartment very neat and tidy, did his own laundry, shopped for his own food. He sounded very independent." (Tr., p. 14).

Agent Jordan testified that no threats or promises were made by anyone to Mr. Bender to

induce him to make the statement. Id.

The proffer lasted approximately two hours. There was a break during the meeting of about ten to fifteen minutes. Id.

Agent Jordan testified that at no time did Mr. Bender or his attorneys indicate that he no longer wished to participate in the proffer. (Tr., p. 15).

On cross-examination, Agent Jordan testified that the attorneys with the defendant were state Public Defenders and that there was a pending state criminal case in which they were representing Mr. Bender. (Tr., p. 15). Agent Jordan testified that he was not aware that the defendant's attorneys were there in their capacity to represent him in federal criminal matters. (Tr., p. 16).

Agent Jordan testified that Mr. Bender was at the proffer for the purpose of attempting to cooperate with the government in an investigation. (Tr., p. 19). Mr. Bender was to provide information about wrongful acts of other people and he was also there to give any and all information about himself, about crimes he may have committed. (Tr., p. 20).

Agent Jordan testified that Mr. Bender had been in special education classes and that he had attended only to the eighth grade. He had started the ninth but did not finish. He said he could read a little but that writing was difficult. (Tr., p. 24).

The defendant said he was disabled. (Tr., p. 25). Mr. Bender talked about seeing four different physicians in Poplar Bluff, but he was never given a specific diagnosis, that he stated that he is just slow and that he had no physical disabilities. (Tr., p. 27). Mr. Bender was told he was slow and could not comprehend things. (Tr., p. 28).

Agent Jordan was asked if, when Mr. Bender told her he was slow and was not able to comprehend things, and considering his misdemeanor, a red flag was raised about whether the

defendant could understand the seriousness of what was happening in that conference room that day and whether he could respond appropriately to questions that were being asked of him?

She answered "No. Because every time we asked him a question he was appropriate. We didn't have to re-explain. We didn't have to put it in simpler terms. I mean, he answered our questions." (Tr., p. 29).

Agent Jordan indicated that Mr. Bender has a full scale IQ score of 58 and that places him with a diagnosis of Mild Mental Retardation. (Tr., p. 32). Mr. Bender admitted that he had problems handling money when he was on alcohol, that he would spend it on alcohol. Id.

With regard to Mr. Bender's stating that he never needed help with cooking, cleaning or bathing, Jordan was asked if her subsequent investigation confirmed that. Agent Jordan responded that people tell her that Mr. Bender is very independent. People say he can act dumb when needed, but he absolutely can take care of himself. He kept his place clean, drove around, actually took care of other people on errands. The agent stated that those are the interviews she conducted. (Tr., p. 34).

When asked if any of the eleven in the room during the interview did not ask questions, Agent Jordan responded that the person with the Medicaid fraud control unit did not ask questions; one of the assistant attorney generals that came with her did not ask questions; she did not remember the Carter County Sheriff person asking any questions; there was another assistant attorney general that she didn't remember asking any questions; she did not remember a Mr. Zoellner asking any questions. (Tr., p. 36).

Mr. Bender described what Endeavor does for patients who cannot take care of themselves and named who the true owners of Endeavor are. (Tr., pp. 36-37). He testified that Steffanie

Kearbey never cooked or cleaned for him, even though those tasks were checked as completed in the papers he signed.

No one made any physical threats towards Mr. Bender to get him to make a statement. (Tr., p. 38).

When asked if the fact that there were eleven government officials in their various official capacities present would have been a threatening atmosphere, Agent Jordan responded, "I didn't think it was threatening. We were very laid back, comfortable, cordial. I mean, those are descriptions that would describe the entire meeting." (Tr., p. 39). Jordan described Mr. Bender as looking pretty comfortable and casual during the questioning. Id. On redirect examination, Agent Jordan indicated that Mr. Bender was never restrained. It was her understanding that the two attorneys who were with him were there to protect the interest of Mr. Bender. (Tr., pp. 40-41). During the meeting, neither of the attorneys suggested that there was anything improper that was going on such that they wanted to stop the interview. (Tr., p. 41).

Mr. Bender appeared to comprehend what was being said to him. Agent Jordan did not know anything about him that would suggest he was under the influence of some substance. (Tr., p. 42).

When asked if there was anything about Mr. Bender that suggested that he was having any difficulty understanding or any problems with comprehension, Agent Jordan responded No.

When asked if she could identify some of the people that she spoke to and what they said about Mr. Bender's abilities that they observed outside of the courtroom, Agent Jordan identified six people by name. (Tr., pp. 44-45). When asked what the people learned or said about Mr. Bender's ability, the general response was he was capable of taking care of himself, that he was independent, except that one Tommy Adams did receive his disability check and paid his bills for him and gave him

the money that was left for him to spend on what he wanted. (Tr., pp. 45-46).

When asked whether she comprehended that the role of Mr. Bender's two attorneys was to protect him, whether that was in reference to the state criminal prosecution that was pending or was it for the potential federal criminal case that was going to result from that meeting, Jordan responded, "I believe they were there to represent his best interest, period." (Tr., p. 48). Mr. Bender was read his Miranda rights; he was not in custody; he was not charged with anything. (Tr., p. 49).

The Defendant's Exhibit A, the Report of Dr. Rosenboom, was introduced into evidence. (Tr., p. 53).

### Report of Interview

The Report of Interview prepared by Agent Jordan was attached to the defendant's Motion to Suppress as Defendant's Exhibit A.

The court has already referred to much of the information in the interview as it was covered during the evidentiary hearing. The court will not again repeat items which have already been commented on.

Mr. Bender has worked in the construction business in the past. He assisted his brother in the building of barns and houses, he built the frames. (Report of Interview, Deft's Ex. A, Document #41, p. 1).

With reference to the defendant's disability, Bender's mother suggested he get disability. He saw four physicians in Poplar Bluff, who determined he was disabled. Greg Melton, the Sheriff of Carter County, took Bender to see the physicians. The physicians asked Bender questions and gave him documents to read. Bender was told he was "slow" and could not comprehend things. He was not given a specific diagnosis, just "slow." When Bender was a young child, he took medication for

hyperactivity. Mr. Bender admitted he could not handle his money because he will spend it on alcohol. He receives $672.00 per month for his disability. When Bender's stepfather moved back to Illinois, Tommy Adams agreed to start receiving the checks for Bender. Adams was the Sheriff of Carter County before his arrest in April 2011 for methamphetamines. Adams took Bender to the Social Security office to make the change and start having his checks sent to Adams. Adams did receive Bender's checks and was supposed to pay all of Bender's bills. Adams gave Bender $10.00 to $20.00 out of his disability check but nothing else. Bender doesn't even know if Adams was paying Bender's bills. (Document #41, p. 2). With reference to his driving, Bender received his first driver's license when he was sixteen, living in Illinois. He continued to drive when he moved to Missouri. He owned a truck at the time of his arrest in April of 2011. He paid for the truck by working odd jobs and some of the money he received from disability. Bender had his truck registered, signed the title, and obtained plates. The title for his truck was in his Endeavor apartment, and Kearbey took it when he cleaned Bender's apartment out.

With regard to the Endeavor Apartments, Mr. Bender said that Richard Kearbey and Scott Joplin are the true owners of Endeavor. Mr. Bender helped build the apartments at Endeavor; he did the concrete and walls. Bender drove himself to the store, purchased his own food with food stamps and cooked his meals in a microwave at his apartment. He has never needed help with cooking or bathing. When Bender was arrested on state charges, Kearbey and Joplin took all of his stuff from his apartment. Bender did not get his belongings back from Kearbey and Joplin.

Concerning his relationship with Endeavor, Bender said Endeavor cares for patients who cannot take care of themselves and need help with bathing, cooking, cleaning, etc. When Bender moved into the Endeavor apartments, Kearbey suggested Bender get services from Endeavor.

Kearbey explained to Bender what a careworker does and what would occur. Kearbey told Bender his daughter, Steffanie Kearbey, would be Bender's worker. Kearbey told Bender up front Steffanie wasn't going to do any services for Bender but would split the money with Bender. When Bender asked Kearbey if he was going to get into any trouble for this, Kearbey told him no, that Kearbey would take care of everything. Kearbey told Bender to get services he needed to act "dumb" in front of the nurses; he told Bender to act like he couldn't take a bath or cook a meal by himself. Bender signed the papers every Wednesday stating Steffanie completed a list of tasks for him. Steffanie would have the forms completed and just need his signature. Bender saw Stephanie's name listed at the bottom of the form indicating she was the worker who completed the tasks listed. Stephanie never cooked or cleaned for Bender, even though they were tasks checked as completed in the papers Bender signed. Bender never got any money from Stephanie. She never split the money she received from Endeavor with him. Adams was also assigned to him at some point as a careworker.

AUSA Dorothy McMurtry, during the interview, read to Bender a list of tasks Bender was supposed to have received from Endeavor. Bender laughed while the list was being read and stated none of the things AUSA McMurtry listed ever occurred. Bender then stated he knew how to scam people and knew Endeavor was a scam. Bender stated Kearbey said he would cover all the tracks so no one would get into any trouble.

Bender was shown Document #49, a time sheet for services provided to Bender with his signature. Bender stated he signed "a bunch of them" but they were blank at the time so he didn't know who was listed as his worker. Bender signed ten to fifteen days worth of blank forms at one time. (Document #41, p. 4).

Bender did handyman work for Stephanie while she was supposed to be providing him with

care services. At Stephanie's home, Bender changed the locks on doors, took down the chimney, put locks on her closet doors where she kept her guns, and cleaned her home when she was getting ready to move in. (Document #41, p. 5).

Bender was paid $30.00 every two weeks for cutting grass at Endeavor. Id.

Bender stated he relied on Kearbey and Adams. Bender has been threatened by Kearbey. Bender is scared of Kearbey because Kearbey has told Bender he could kill him. Kearbey has told Bender in the past "They can find you some day in a ditch." Id.

With reference to drugs, Bender stated he would get meth from Adams and call Stephanie to come over to his apartment. Stephanie would come over to Bender's apartment alone to "party and get high." (Document #41, pp. 5- 6).

Bender was a "watchout" for Achter while Achter burglarized Robert Boone's home.

Kearbey told Bender to burn down Raymond McGarrity's trailer, who was in competition with Kearbey in the home care business. (Document #41, p. 6). Kearbey told Bender to burn down Michelle Turner's trailer. Bender burned down Turner's trailer.

## Report of Dr. Jon Rosenboom

At the end of the evidentiary hearing, Report of Jonathan D. Rosenboom, Psy.D., Clinical Psychologist, was offered as Defendant's Exhibit A. The report is dated November 12, 2007. It is part of records of the Social Security Administration. It accompanied a psychiatric review technique signed by Christy A. Parker, listed as a "MC/PC." Christy Parker is identified elsewhere in the Social Security records as a Senior Counselor with the Section of Disability Determinations of the Department of Elementary and Secondary Education of the State of Missouri. Dr. Rosenboom's DSM-IV diagnoses were Axis I: Depressive Disorder, not otherwise specified - Alcohol Dependence,

reportedly in recent remission; Axis II: Mild Mental Retardation (principal diagnosis) - Antisocial personality features.

Also included in the Social Security records is a portion of Gary Wayne Bender's transcript from Community Unit School District No. 9 in Granite City, Illinois. The partial transcript indicates that he was placed in the ninth grade but that he dropped out of the ninth grade.

## Conclusion

The defendant was interviewed pursuant to a written proffer agreement. He was accompanied to the meeting with two Missouri Public Defenders. Prior to any questions being asked, the defendant's attorneys read and explained the proffer agreement to the defendant. He was given an opportunity to ask questions of his attorneys. He then signed the agreement. The defendant was seated at a large conference table, as were some of the other persons who were present. He was not restrained in any way and was able to consult with his attorneys during the proffer.

Agent Jordan stated that Mr. Bender was "Very relaxed. Very cordial. ... It just seemed like a very open, comfortable atmosphere." Jordan testified that Mr. Bender's responses to the questions were appropriate in the sense that he understood the questions, and the answers were responsive. Mr. Bender indicated that he had difficulty with reading and with spelling. At one point in time, Bender said he was instructed to act dumb in order to get the services that he needed or that they wanted him to have.

Mr. Bender indicated that he was able to operate a motor vehicle.

With respect to the daily activities of life, Mr. Bender said he can cook, clean, even described himself as a clean freak, did his own laundry, shopped for his own food. He sounded very independent to Jordan.

Agent Jordan testified that no threats or promises were made by anyone to Mr. Bender to induce him to make the statement. The proffer lasted approximately two hours. There was a break during the meeting of about ten to fifteen minutes. At no time did Mr. Bender or his attorneys indicate that he no longer wished to participate in the proffer.

Agent Jordan testified Mr. Bender was at the proffer for the purpose of attempting to cooperate with the government in an investigation. Bender was to provide information about wrongful acts of other people, and he was also there to give any and all information about himself, about crimes he may have committed.

Agent Jordan testified that Mr. Bender had been in special education classes and that he had attended only to the eighth grade. He had started the ninth but did not finish. He said he could read a little but that writing was difficult.

The defendant said he was disabled. He talked about seeing four different physicians in Poplar Bluff, but he was never given a specific diagnosis, that he stated he is just slow and he had no physical disabilities. Mr. Bender was told he was slow and could not comprehend things.

Agent Jordan indicated that Mr. Bender has a full scale IQ score of 58, and that places him in a category of Mild Mental Retardation. Mr. Bender admitted that he had problems handling money when he was on alcohol, that he would spend it on alcohol.

Agent Jordan was asked if her subsequent investigation confirmed whether Mr. Bender needed help with cooking, cleaning or bathing, Jordan responded that people told her that Mr. Bender is very independent. People say he can act dumb when needed, but he absolutely can take care of himself. Agent Jordan named six persons she specifically talked to about whether Mr. Bender was independent or not.

Agent Jordan stated that of the eleven representatives of various agencies present for the proffer, five did not ask any questions.

During the meeting neither of Mr. Bender's attorneys suggested that there was anything improper going on, such that they wanted to stop the interview.

Agent Jordan testified that Mr. Bender appeared to comprehend what was being said to him during the proffer. Agent Jordan did not know anything about him that would suggest that he was under the influence of some substance during the proffer.

Mr. Bender worked in the construction business in the past. He assisted his brother in the building of barns and houses, he built the frames.

Mr. Bender bought a truck with money he earned from working odd jobs and some of the money he received from disability. He had his truck registered, signed the title and obtained plates. He said he helped build the apartments at Endeavor and did the concrete and walls. He said he drove himself to the store, purchased his own food with food stamps and cooked his meals in a microwave at his apartment.

During the proffer, Mr. Bender said he did handyman work for Steffanie Kearbey while she was supposed to be providing him with care services. At Steffanie's home, he changed the locks on doors, took down the chimney, put locks on her closet doors where she kept her guns, and cleaned her home when she was getting ready to move in.

Bender was paid $30.00 every two weeks for cutting grass at Endeavor.

With reference to criminal activity, Bender said he served as a "watchout" for another person who committed a burglary. The burglar was named Achter, and Robert Boone's home was burglarized. Bender admitted burning down Raymond McGarrity's trailer and Michelle Turner's

trailer. These arsons were committed at the direction of Richard Kearbey.

At the end of the evidentiary hearing, the report of Jonathan D. Rosenboom, Psy.D., Clinical Psychologist, was offered into evidence as Defendant's Exhibit A. The report is dated November 12, 2007. Dr. Rosenboom's diagnoses were Axis I: Depressive Disorder, not otherwise specified-Alcohol Dependence, reportedly in recent remission; Axis II: Mild Mental Retardation (principal diagnosis)-Antisocial personality features).

No one at the proffer meeting or since that time has questioned Mr. Bender's accuracy or veracity with regard to his statements.

In this Report, the court has reviewed in tedious detail the information produced at the evidentiary hearing and in the report of the proffer interview. That information demonstrates that the defendant, Gary Wayne Bender, understood the fraud perpetrated by Endeavor, by the persons associated with Endeavor and by himself. He understood the workings of the scheme and his participation in the scheme. He acknowledged his actions in burning down two trailers and the motivation of those who asked him to commit the arsons.

The court has considered the report of Dr. Rosenboom which finds that the defendant is mildly mentally retarded and has a depressive disorder, not otherwise specified. Dr. Rosenboom's report was submitted as part of the defendant's application for Social Security Disability. Dr. Rosenboom's report is dated November 12, 2007, four years prior to the time the proffer agreement was signed in 2011.

The defendant was examined by four doctors in Poplar Bluff, Missouri, but no diagnosis by

those doctors was given. He was told he was "slow" and that he could not comprehend things.

The court is aware that Mr. Bender testified that he was told to act "dumb" so that he could get the disability others wanted him to have.

Agent Jordan interviewed individuals who provided the information that Mr. Bender was very independent, and this was the testimony of Mr. Bender himself.

The government has provided a helpful service in gathering statements of the law, from the Eighth Circuit and other circuits, that are pertinent to Mr. Bender's case. The Government's Response (Document #43 at page 2) contains the following with regard to waivers of one's Fifth Amendment rights by persons with intellectual or other disabilities:

> The Eighth Circuit and other federal courts of appeal have found waivers to be valid although the defendants had the same limitations--a low IQ and limited education, as defendant Bender. E.g., United States v. Quinn, 130 Fed.Appx. 832 (voluntary statement by defendant with limited intelligence and reading ability); United States v. Turner, 157 F.3d 552, 555-56 (8th Cir. 1998)(valid waiver by defendant with low IQ, mental illness, and PCP intoxication); United States v. Makes Room for Them, 49 F.3d 410, 412-15 (8th Cir. 1995)(valid waiver by 19 year old defendant with average or lower than average intelligence and eighth grade education); United States v. Hall, 969 F.3d 1102, 1105 (D.C. Cir. 1992)(valid consent by 18 year old defendant with low IQ, second grade reading level, and psychological problems); Correll v. Thompson, 63 F.3d 1279, 1288 (4th Cir. 1995)(valid waiver by 24 year old defendant with IQ of 68 and prior experience with legal system); United States v. Macklin, 900 F.2d 948, 950-53 (6th Cir. 1990)(statement voluntary by defendant with IQ of 59; unable to read written instructions; very limited capacity to understand verbal instructions), cert. denied, 498 U.S. 840 (1990); Rice v. Cooper, 148 F.3d 747, 749-52 (7th Cir. 1998)(valid waiver by illiterate defendant with mild mental handicap), cert. denied, 526 U.S. 1160 (1999); United States v. Chischilly, 30 F.3d 1144, 1147-48 (9th Cir. 1994)(valid confession by defendant with verbal IQ of 62 and functional level of five or six year old child); Moore v. Dugger, 856 F.2d 129, 131-34 (11th Cir. 1988)(valid waiver by defendant with IQ of 62 and the intellectual level of 11 year old child).

The court is especially impressed by the defendant's detailed knowledge of and appreciation of the actions he and other individuals took with regard to the alleged fraud perpetrated by Endeavor

and those associated with Endeavor and the offenses they have committed, as well as offenses Mr. Bender allegedly committed. He appears to have had full understanding of the importance of others' actions and of his own actions.

Nothing in the evidentiary hearing nor in the Report of Interview revealed any attempt to intimidate Mr. Bender or of "coercive police activity" exerted against Mr. Bender. The mere presence of law enforcement from different jurisdictions did not appear to have an effect on the atmosphere of the proffer at which Mr. Bender appeared relaxed and cordial. Mr. Bender knew what offenses had been committed in Carter County, Missouri, as well as the fraud that allegedly took place in the activities of Endeavor and should not have been surprised that representatives of the Department of Health and Human Services were interested or the Highway Patrol or other agencies would be interested in the details of the arsons he committed.

Mr. Bender is familiar with the American criminal justice system. He has been convicted of four felonies: Burglary, Stealing, Armed Robbery and Vehicle Theft. He has been received at the Missouri Department of Corrections and Illinois Department of Corrections. He has been convicted of many misdemeanors and traffic offenses. At the time he gave his proffer on September 22, 2011, there were pending against him in Butler County, Missouri, on changes of venue from Carter County four counts of Arson in the Second Degree and two counts of Distribution, Delivery, Manufacturing a Controlled Substance.

The court finds that the defendant's will was not overborne by any of the participants in the proffer-interview, nor by the presence of eleven law enforcement officials or representatives of state or government agencies. No reports by any of the four physicians Mr. Bender saw in Poplar Bluff were presented, and those physicians gave no diagnosis other than that he was "slow" and did not

"comprehend."

Considering the totality of the evidence before it, the court finds that the defendant made a knowing, intelligent and voluntary statement during the proffer interview.

The court finds further the defendant was present voluntarily for the proffer. He was there to help himself as well as the government and certainly had the capacity to resist any pressure to feel compelled to make a statement as demonstrated by his demeanor and cooperative attitudes during the proffer.

The statements of the defendant at the proffer interview should not be suppressed.

**IT IS HEREBY RECOMMENDED** that defendant's Motion to Suppress (Document #40) be denied.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

/s/ Lewis M. Blanton

_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of October, 2013.